OPINION OF THE COURT
Harold R. Soden, J.
On November 5, 1976, Donald R. Day and Lorraine T. Day were burned to death in their 1975 Ford Pinto. Their car was *647 struck by defendant Rockhill’s car at the intersection of Route 11 and Creighton Road in the Town of Malone, County of Franklin, State of New York. Donald, 54, was a carpenter. Lorraine, 47, was a housewife. The Days are survived by their three daughters: Bonnie, 31, the plaintiff administratrix, Diane, 27, and Terry, 24.
The defendants, as named in the caption, are: manufacturer of the Day automobile, servicer/repairer of the Day automobile, retailer of the Day automobile and driver of the vehicle that hit the Day automobile.
In June of 1978, plaintiff made four motions:
(1) To amend the complaint to assert a new tenth wrongful death cause of action claiming punitive damages in the amount of $125,000,000 in the ad damnum portion of that cause of action against defendant Ford;
(2) A motion to amend the complaint to assert a "pain and suffering” or survival cause of action for Donald Day and to make the ad damnum for that cause of action $6,000,000;
(3) A motion to preclude defendant from putting in proof concerning defendants’ affirmative defenses because defendants have failed to serve a bill of particulars;
(4) A motion to depose the former corporate officer of defendant Ford Motor Company, one Lee Iacocca.
All defendants oppose the above motions. Defendant Ford cross-moves for a protective order against plaintiff’s notice to discover and inspect.
After extensive briefs and oral arguments, the matter was finally submitted on or about November 20, 1978.
The decision will be divided into five parts. I thru IV will consider plaintiff’s motions as above; V will consider defendants’ cross motions for a protective order. (Plaintiff’s technical motions to correct the caption and repeat and reallege certain allegations are granted.)
I. INTRODUCTION
New York’s survival statute (see EPTL 11-3.2) specifically prohibits an award for punitive damages. That statute is not at issue in this case.
New York’s wrongful death statute (EPTL 5-4.1, 5-4.3) does not speciñcally deny punitive damages but rather limits damages to the "fair and just compensation for the pecuniary *648 injuries resulting from the decedent’s death to persons for whose benefit the action is brought”. Judicial precedent in New York disallows any award for punitive damages in a wrongful death cause of action.
However, punitive damages are now and have been allowable under New York common law in a proper case (see 9 Fuchsberg, Encyclopedia New York Law, Damages Law, §§ 61-67; see, also, Day v Woodworth, 54 US 363, 371). Thus, plaintiff challenges the interpretation and application of New York’s wrongful death statute and claims. The injury/death classification is an irrational and unconstitutional classification since punitive damages are otherwise awardable in this case.
Both plaintiff and defendant Ford borrow heavily from the arguments of counsel in Matter of Paris Air Crash of March 3, 1974 (427 F Supp 701). The District Court there held that denial of punitive damages in wrongful death cases, while they are permitted in personal injury and property damage cases, is violative of equal, protection of the laws guaranteed by the United States and California Constitutions.
A. WRONGFUL DEATH CAUSE OF ACTION IN NEW YORK
The wrongful death cause of action did not exist under New York or English common law. But it was not unknown in the history of Western jurisprudence: see, for example, the Icelandic Sagas, and specifically Njala’s Saga.
"Up until 1846, the date of Lord Campbell’s Act in England, English courts held that there was no right of action for wrongful death, Baker v. Bolton, 1 Camp. 493, 170 Eng. Rptr. 1033 (1808). This holding itself has been much criticized and was probably fallacious. See Moragne v. States Marine Lines, 398 U.S. 375, 382-383, 90 S. Ct. 1772, 26 L. Ed. 2d 339, 347 (1970).
"The rule, fallacious or not, was based upon the 'felony-merger’ doctrine which had provided that when death was caused by a wrongful act it was a felony. The tort merged into the felony, the felon was put to death and his property was forfeited to the Crown, so that nothing remained of the felon or his property on which to base a civil action. Based on this the English courts held that there was no right of action for wrongful death at common law, Moragne v. States Marine Lines, supra.
*649 "The felony-merger doctrine never existed in the United States. Nevertheless, American courts followed the English rule, as stated in Baker v. Bolton, and it was uniformly established in the United States that there was no right of action for wrongful death, Moragne v. States Marine Lines, supra, at pages 382-388.” (Brief of Plaintiff/Appellee, pp 6-7 in Matter of Paris Air Crash, supra.)
New York’s first wrongful death statute was enacted in 1847 (L 1847, ch 450). It was similar to Lord Campbell’s Act, but differed in providing: "the jury may give such damages as they shall deem fair and just, with reference to the pecuniary injury”. (Italics supplied.) (Cf. Draft Uniform Product Liability Law, § 118, "Non-Pecuniary Damages”, 44 Fed Reg 9, p 3002, hereinafter "Draft Act”; see, also, Lehman v Columbia Presbyt. Med. Center, 93 Misc 2d 539.) The court interpreted "pecuniary” in EPTL 5-4.3 to allow a surviving spouse a recovery for loss of consortium in a wrongful death cause of action (Martins v Ford, 53 AD2d 887; Sea-Land Servs. v Gaudet, 414 US 573). In 1848, the wrongful death statute was amended to limit recovery to $3,000; this figure was later raised to $5,000.
This ceiling was much criticized. In 1894, the New York Constitutional Convention adopted the following amendment to article I: "§ 18. The right of action now existing to recover damages for injuries resulting in death, shall never be abrogated; and the amount recoverable shall not be subject to any statutory limitation.” In 1939, this amendment was renumbered section 16 of article I of the New York Constitution.
The record of the 1894 Constitutional Convention indicates that this constitutional prohibition was intended to give the wrongful death statute a greater deterrent effect. (See, e.g., NY Const Convention, 1894, rev record, vol 2, p 623; see, also, 3 Lincoln Constitutional History of New York, pp 59-63.) It is noted that the New York State Legislature is no longer empowered to repeal the wrongful death statute.
Neither plaintiff nor defendants set forth the legislative history of New York’s 1847 wrongful death statute or the legislative history of New York’s first survival statute adopted in 1935. Plaintiff argues that the word "pecuniary” includes exemplary and/or vindictive damages. Defendant Ford argues that "pecuniary” excludes exemplary or vindictive or punitive damages.
*650 B. PUNITIVE DAMAGES IN NEW YORK
"Exemplary or punitive damages are different, both in their nature and the purpose for which they are awarded, from compensatory damages, for they are not assessed on the theory of compensation only, but in addition thereto as a punishment and as an example to deter the defendant and others from doing similar wrongful acts. As similarly stated, exémplary or punitive damages act not by way of compensation but by way of punishment of the wrongdoer and as an example to others; besides making good the loss, they serve to punish and make an example of the wrongdoer.
"The public policy of New York does not prohibit exemplary or punitive damages. The right to award such damages was upheld in a véry early New York case [Tillotson v Cheetham, 3 Johns 56], and the rule is now well established in our state, in accordance with that prevailing in most jurisdictions in this country, that in a proper action and under proper circumstances damages beyond the actual injury sustained may be awarded for the sake of the example and to punish the wrongdoer. Accordingly, as a general rule, exemplary damages may be awarded in all actions of tort in which actual malice or wantonness is in fact involved, including what is known at common law as an action on the case. Exemplary damages may be awarded in a proper case though no actual damages are proved, and the recovery of compensatory damages is consequently restricted to nominal damages.” (See 9 Fuchs-berg, Encyclopedia of New York Law, Damages, § 61, pp 47-48; see, also, Chase Manhattan Bank, N.A. v Perla, 65 AD2d 207; Restatement 2d, Torts, §§ 901, 908, subd [1]; Zarcone v Perry, 572 F2d 52.)
"To warrant a punitive damage award, there must be proof of recklessness, or a conscious disregard of the rights of others * * *
"Against a corporation punitive damages may be awarded only if its officers or directors authorized, participated in, consented to, or after discovery, ratified the conduct giving rise to such damages * * *
"The claim for punitive damages is not a separate cause of action, Knibbs v Wagner, 14 AD2d 987, 222 NYS2d 469. So long as the complaint states facts authorizing the award of such damages, it is not necessary that they be specifically demanded nor will plaintiff be required to furnish a bill of *651 particulars stating whether such damages are claimed”. (1 NY PJI2d 2:278, Comment, pp 622-626 and cases cited therein; see, also, Draft Act, § 102, subd [3]; § 120 and analyses thereto, 44 Fed Reg 9, pp 2998, 3002, 3003, 3018-3019.)
"Punitive damages is a sanction reserved to the State, a public policy of such magnitude as to call for judicial intrusion to prevent its contravention * * * As was stated in Walker v Sheldon [10 NY2d 401, 404], '[p]unitive or exemplary damages have been allowed in cases where the wrong complained of is morally culpable, or is actuated by evil and reprehensible motives, not only to punish the defendant but deter him, as well as others who might be otherwise so prompted, from indulging in similar conduct in the future.’ It is a social exemplary 'remedy’, not a private compensatory remedy” (see Garrity v Lyle Stuart, Inc., 40 NY2d 354, 356-358). The Court of Appeals in Garrity refused to allow an arbitrator to award punitive damages. The Garrity case was decided by a 4-3 margin. A vigorous dissent by Judge Gabrielli would have allowed an arbitrator to impose punitive damages in a contract case.
The Court of Appeals in Borkowski v Borkowski (39 NY2d 982) affirmed its holding in Walker v Sheldon (supra): punitive damages are awardable in a fraud cause of action even if the fraud was not aimed at the public generally. In Nardelli v Stamburg (44 NY2d 500, 503-504), the Court of Appeals reversed the Appellate Division’s reversal of judgment insofar as it awarded punitive damages in the following language:
"In a case such as this, in which liability is to be imposed upon the wrongdoer himself, a finding of liability for malicious prosecution precludes a determination as a matter of law that punitive damages are improper, for the actual malice necessary to support an action for malicious prosecution also serves to justify an award of exemplary damages. '[I]n torts which, like malicious prosecution, require a particular anti-social state of mind, the improper motive of the tortfeasor is both a necessary element in the cause of action and a reason for awarding punitive damages’ (Restatement, Torts, Comment c, § 908). Thus, the Appellate Division incorrectly held as a matter of law that plaintiff had no claim for exemplary damages.
"This is not to say, of course, that exemplary damages must be awarded in every such action, for the trier of facts is not required to make such an award simply because it may do so *652 (see 14 NY Jur, Damages, § 177). Whether to award punitive damages in a particular case, as well as the amount of such damages, if any, are primarily questions which reside in the sound discretion of the original trier of the facts (see Kujek v Goldman, 150 NY 176, 180; Walker v Sheldon, 10 NY2d 401, 405), in this case the jury, and such an award is not lightly to be disturbed. This does not mean that the Appellate Division or the trial court Judge may never interfere with such a jury award; those courts may, of course, exercise their own discretionary authority to overturn an excessive jury verdict and order a new trial unless the plaintiff will consent to a reduction in amount (see Faulk v Aware, Inc., 19 AD2d 464, affd without opn 14 NY2d 899; Gostkowski v Roman Catholic Church, 237 App Div 640, affd 262 NY 320). We would caution, however, that the amount of exemplary damages awarded by a jury should not be reduced by a court unless it is so grossly excessive 'as to show by its very exorbitancy that it was actuated by passion’ (1 Clark, New York Law of Damages, § 56, p 102; accord Restatement, Torts, Comment d, § 908; 14 NY Jur, Damages, § 188).”
Borkowski and Garrity illustrate a strong State interest in the continuing evolution of the common-law right to seek punitive damages. Recently, in Le Mistral v Columbia Broadcasting System (61 AD2d 491), the Appellate Division, First Department, held punitive and compensatory damages are properly assessable for a trespass committed in the course of news gathering (see Survey of New York Practice, 52 St Johns L Rev, 670-675), indicating there is no constitutional problem with an award of punitive damages in this sensitive First Amendment area and expanding the possibility of punitive damages in all trespass actions. Nardelli expresses the Court of Appeals confidence in the jury system when faced with a request to assess punitive damages.
In contract, the Draft Act provides (44 Fed Reg 9, p 3002):
"SeC. 120. PUNITIVE DAMAGES
"(a) Punitive damages may be awarded if the claimant shows by clear and convincing evidence that the harm suffered was the result of the product seller’s reckless disregard for the safety of product users, consumers, or bystanders who might be injured by the product.
"(b) If the trier of fact determines that punitive damages should be awarded, the court shall determine the amount of *653 those damages. In making this determination, the court shall consider:
"(1) The likelihood at the time of manufacture that a serious harm would arise from the product seller’s misconduct;
“(2) The degree of the product seller’s awareness of that likelihood;
"(3) The profitability of the misconduct to the product seller;
"(4) The duration of the misconduct, and any concealment of it by the product seller;
"(5) The attitude and conduct of the product seller upon discovery of the misconduct;
"(6) The financial condition of the product seller; and
"(7) The total effect of other punishment imposed or likely to be imposed upon the product seller as a result of the misconduct, including punitive damage awards to persons similarly situated to claimant and the severity of criminal penalties to which the product seller has been or may be subjected.”
C. EQUAL PROTECTION
Section 11 of article I of the New York Constitution states in pertinent part "[n]o person shall be denied the equal protection of laws of this state or any subdivision thereof’.
The equal protection clause above quoted has been held to be no broader than the equal protection clause of the United States Constitution, Fourteenth Amendment (Dorsey v Stuyvesant Town Corp., 299 NY 512, 530-531, cert den 339 US 981; Olin v Town of North Hempstead, 34 Misc 2d 853, 858, affd 18 AD2d 831, affd 13 NY2d 782). However, the decision in Alevy v Downstate Med. Center of State of N. Y. (39 NY2d 326) indicates the adoption in New York of a "middle ground test” when courts are confronted with a "denial of equal protection” claim. Such a middle ground test has recently been applied in a case of far reaching implications (see Board of Educ. v Nyquist, 94 Misc 2d 466).
The New York Court of Appeals stated the middle tier test in Alevy (supra, at p 336) as follows:
"We are of the view that in deciding an issue of whether reverse discrimination is present, the courts should make proper inquiry to determine whether the preferential treat *654 ment satisfies a substantial State interest. In determining whether a substantial State interest underlies a preferential treatment policy, courts should inquire whether the policy has a substantial basis in actuality, and is not merely conjectural. At a minimum, the State-sponsored scheme must further some legitimate, articulated governmental purpose. However, the interest need not be urgent, paramount or compelling. Thus, to satisfy the substantial interest requirement, it need be found that, on balance, the gain to be derived from the preferential policy outweighs its possible detrimental effects.
"If it be found that the substantial interest requirement is met, a further inquiry must be made as to whether the objectives being advanced by the policy could not be achieved by a less objectionable alternative; for example, by reducing the size of the preference, or by limiting the time span of the practice. Additionally, where preference policies are indulged, the indulgent must be prepared to defend them. Courts ought not be required to divine the diverse motives of legislators, administrators or, as here, educators.” .
The fundamentals of equal protection analysis are set forth in Alevy v Downstate Med. Center of State of N. Y. (supra, at pp 332-334).
Defendant Ford asserts that the applicable standard of review is the rational basis test as set forth in McGown v Maryland (366 US 420, 426): "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.” (Italics supplied.)
Nor is the "middle tier scrutiny” test confined to reverse discrimination cases; it can be applied when a "cogent reason” is found for its application (Riley v County of Monroe, 43 NY2d 144, 149).
Paralleling the developments in Alevy (supra) and suggesting that "it may be honing a third edge to the equal protection sword”, the United States Supreme Court, in Craig v Boren (429 US 190) struck down an Oklahoma statute on the basis of discrimination against a class of 18-year-old males in the purchase of 3.2 beer in language which makes a particular classification constitutionally sound if it "serve[sj important governmental objectives and must be substantially regulated to achievement of those objectives”. (Craig v Boren, supra, at p 197; see Matter of Paris, supra p 708.).
"The Court is mindful that the rational basis test when applied to constitutional concerns of statutory enactment or *655 application cannot be a subjective view of what this Court believes is best for society”. (See Matter of Paris Air Crash of March 3, 1974, 427 F Supp 701, 706, supra.) Similarly, the court is aware that developments under the "new equal protection” may be "unsettling” or "troubling” and, if abused, could erode the foundation of separation of powers and the proper limits of constitutional review (see Dixon, The Supreme Court and Equality: Legislative Classifications, Desegregation, and Reverse Discrimination, 62 Cornell L Rev, 494, 532).
D. DECISION
New York’s wrongful death statute (EPTL 5-4.3) must be interpreted as not abrogating a right to seek punitive damages in this case. This holding avoids an unconstitutional interpretation of the statute (see McKinney’s Cons Laws of NY, Book 1, Statutes, § 150, subd c, and cases cited therein; see generally, McKinney’s, Statutes, §§ 141-153).
Alternatively, insofar as the wording, application and interpretation of New York’s wrongful death statute deny the recovery of punitive damages in a wrongful death case, while they are permitted in personal injury and property damages cases in New York, they are violative of the equal protection of laws as guaranteed by the Fourteenth Amendment of the United States Constitution and section 11 of article I of the New York Constitution. The injury/death classification is a most egregious form of invidious discrimination (62 Cornell L Rev, p 533) which is an historical anomaly.
What defendants appear to argue is that the word "pecuniary” in New York’s wrongful death statute creates the injury/ death classification and the distinction is therefore conclusively presumed to be rational. Indirectly, through submission of defendant/appellant McDonald Douglas Corporation’s brief to the 9th Circuit in the Matter of Paris Air Crash case, defendant Ford argues that the injury/death classification is rational for two main reasons: (1) the danger of excessive recoveries and (2) discouragement of marginal litigation and encouragement of realistic settlements. Other than this, defendants do not identify New York State’s interest in allegedly denying punitive damage recoveries in a wrongful death case. Noting the State’s concerns as in Nos. 1 and 2 above does not explain "how those interests are served or enhanced by the discriminatory classification of wrongful death claimants different than personal injury or property damage claimants. *656 This is particularly true when it is remembered that it is the egregious conduct of a tort-feasor that employs the need for the deterrence of punitive damages and not the nature of the harm caused by the conduct” (see Matter of Paris Air Crash, supra, at p 707) or the instrumentality connected with the causation of harm. The inquiry here, in essence, is identical with the inquiry in the California case: How does depriving wrongful death claimants of punitive damages in any way serve or enhance the State’s articulated public policy of allowing punitive damage awards in proper cases to deter egregious conduct of tort-feasors? "Punitive damages are addressed not to the right of recovery but rather to the nature and gravity of the invasion of a plaintiffs right”. (See Matter of Paris Air Crash, supra, at p 706.)
"As set forth in the 'Recommendation and Study Relating to Survival of Actions’ of the California Law Revision Commission, October, 1960, the commission concluded that there was no valid reason for an exclusion of punitive damages in death cases. While the commission’s language was directed specifically to the survival statute, its words were of general applicability: 'The provision of the 1949 legislation that the right to recover punitive or exemplary damages is extinguished by the death of the injured party should not be continued. There are no valid reasons for this limitation. True, such damages are in a sense a windfall to the plaintiffs heirs or devisees, but since these damages are not compensatory in nature, they would have constituted a windfall to the decedent as well. The object of awarding such damages being to punish the wrongdoer, it would be particularly inappropriate to permit him to escape such punishment in a case in which he killed rather than only injured his victim’ ”. (See plaintiff appellee’s brief, pp 12-13, in Matter of Paris Air Crash, supra.)
The language in the Garrity case above supports this view.
There are cogent reasons for applying the Alevy and Craig "middle tier scrutiny” tests: to analyze whether a preferential treatment policy should continue. New York’s wrongful death statute clearly grants preferential treatment to tort-feasors who have killed their victims compared to tort-feasors who have injured their victims. No substantial State interests underlies this preferential treatment policy in actuality. Such State interest is only conjectural, an historical accident. The State sponsored scheme does not further any legitimate articulated governmental purpose. On balance, the preferential *657 policy has obvious detrimental effects which outweigh its gains.
“Logic dictates that if a wrongdoer may be punished if his victim lives, why then surely he should not escape retribution if his wrongful act causes a death” (see Leahy v Morgan, 275 F Supp 424, 425). The Draft Act, in subdivision (3) of section 102 provides (44 Fed Reg 9, p 2998): “ 'Claimant’ means a person asserting a legal cause of action or claim and, if the claim is asserted on behalf of an estate, claimant includes claimant’s decedent. Claimants include product users, consumers, and bystanders who are harmed by defective products.”
E. CONCLUSION
The requested amendment as set forth in the proposed amended complaint is granted.
[Portions of opinion omitted for purposes of publication.]